
FILED
John E. Triplett, Acting Clerk
United States District Court

By CAsbell at 3:11 pm, Sep 04, 2020

# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

|  |  |
|---|---|
| MILFORD CASUALTY INS. CO., <br><br>     Plaintiff, <br><br>     v. <br><br> WILLIAM STACY MEEKS; ABDI MAHAD; AND BIH EXPRESS, INC., <br><br>     Defendants. | CV 5:20-cv-36 |

## ORDER

Before the Court is Plaintiff Milford Casualty Ins. Co.'s ("Milford") Motion for Summary Judgment, dkt. no. 16, wherein Milford seeks declaratory relief against Defendants William Stacy Meeks, Abdi Mahad, and BIH Express, Inc. ("BIH") (collectively "Defendants"). Defendants Mahad and BIH have not responded to Milford's motion, and the Court will therefore assume that they do not oppose it. See S.D. Ga. L.R. 7.5. Defendant Meeks, however, has responded, and the motion as it concerns Meeks has been fully briefed and is ripe for review. Separately before the Court is Defendant Meeks' Motion to Dismiss asking that this Court exercise its discretion not to hear Milford's action under the Declaratory Judgement Act because a parallel state action is pending. Dkt. No.

30. For the reasons below, Meeks Motion to Dismiss will be **DENIED** and Milford's Motion for Summary Judgment will be **GRANTED**.

## BACKGROUND

For purposes of summary judgment, the Court will construe the facts in a light most favorable to Meeks. See S.E.C. v. Monterosso, 756 F.3d 1326, 1333 (11th Cir. 2014). In the early morning hours of December 18, 2016, Mahad was driving a tractor trailer on behalf of BIH when he lost control of the vehicle, which overturned and began to slide across the highway and into the lane of travel in which Defendant Meeks was driving. See Dkt. No. 14 ¶ 9; see also Dkt. No. 27 at 1; Dkt. No. 27-1; Dkt. No. 28 ¶ 1-3, 6. Meeks' vehicle collided into Mahad's truck, knocking Meeks unconscious. Dkt. No. 27 at 1-2. When Meeks awoke sometime later, he called 911 on his phone, and then walked to the overturned truck to check on Mahad. Id. at 2. According to Meeks, when he arrived at the truck, he saw Mahad standing up in the overturned cab with papers stuffed under his arm and looking through other papers scattered about the floor. Id. at 2. Mahad informed Meeks that he was okay, and Meeks walked away. Id.

Sometime thereafter, vehicles driven by non-parties Scott Buchanan and Roy Johnson also collided into Mahad's truck, injuring both. See Dkt. No. 27-5; see also Dkt. No. 27-6; Dkt. No. 27-4 at 14-15; Dkt. No. 35. However, the timing of those accidents is unsettled. Meeks testified in his deposition that he does not know

how long he was unconscious after the accident nor does he know how long he remained in his car after he regained consciousness. Dkt. No. 27-4 at 13. He also does not know the amount of time that passed between his accident and the second collision, but he believed it was greater than five minutes. See id. at 15. He introduced a recording of his 911 call after the accident which, according to his interpretation, shows that six minutes and twelve seconds passed between his initial call and the second wreck involving Buchanan and that another one minute and twenty-five seconds passed between Buchanan's wreck and the final wreck involving Johnson. See Dkt. No. 27 at 3 (citing Dkt. No. 27-7).

BIH is the named insured under a motor carrier liability policy (the "Policy") that was issued in Kentucky and assumed by Milford. Dkt. No. 28 ¶¶ 10-11. The Policy obligates Milford to pay all applicable bodily injury or property damage claims "caused by an 'accident' and resulting from the ownership, maintenance, or use of covered 'autos'." Id. ¶ 15 (quoting Dkt. No. 14-1 at 128). The term "Accident" is defined as "continuous or repeated exposure to the same conditions resulting in 'bodily injury.'" See Dkt. No. 28 ¶ 13 (quoting Dkt. No. 14-1 at 148).

The Policy also contains a "Limit of Insurance" provision that states, in pertinent part:

> Regardless of the number of covered 'autos', 'insureds', premiums paid, claims made or vehicles involved in the 'accident', the most we will pay for the total of all

3

> damages. . . combined resulting from any one 'accident' is the Limit of Insurance for Covered Autos Liability Coverage . . . All 'bodily injury' [and] 'property damage' . . . resulting from continuous or repeated exposure to substantially the same conditions will be considered as a resulting from one 'accident'."

Dkt. No. 14-1 at 136. The limit of insurance, as stated on the declarations page, is one million dollars per accident. See Dkt. No. 14-1 at 24.

At some point after the accident, Buchannan, Johnson, and Meeks asserted claims against BIH for injuries sustained in the accident. See Dkt. No. 28 ¶ 9. Though the parties seemingly dispute the nature and timing of the payout, it is undisputed that Milford paid at least one million dollars in settlement of the claims of one or more parties other than Meeks. See id; see also Dkt. No. 33 at 2. In August 2018, Meeks filed an action in the Superior Court of Charlton County, Georgia, contending that BIH and Mahad were liable to him for his injuries; the Complaint also named Milford as a party under O.C.G.A. § 40-2-140.[1] Dkt. No. 18-1. While that action was pending, Milford filed the present action seeking a declaration under the Declaratory Judgment Act that it has exhausted its limits under the Policy and that it "owes no indemnity coverage" to Meeks nor has any obligation to provide a defense to any party in the underlying action. Dkt. No. 14. Milford

---

[1] O.C.G.A. § 40-2-140(d)(4) provides, in pertinent part, that "[a]ny person having a cause of action, whether arising in tort or contract . . . may join in the same cause of action the motor carrier and its insurance carrier."

4

thereafter filed the present motion for summary judgment, contending that it was entitled to judgment on this issue as a matter of law. Meeks opposes Milford's motion, contending that his collision with Mahad's truck was a separate "accident" under the Policy and therefore Milford's settlement with other parties did not exhaust coverage available to him. For the reasons below, Milford is entitled to summary judgment as a matter of law.

**I.   Motion to Dismiss**

In his Motion to Dismiss, Meeks argues that courts are vested with discretion under the Declaratory Judgment Act to decline to hear an action for declaratory relief and that because a separate parallel action is pending in state court, the Court should decline to hear Milford's action here. For two reasons, the Court rejects Meeks' request that the Court dismiss Milford's action.

First, Meeks' motion is untimely. After Milford filed its action in March 2020, Meeks and the other named Defendants failed to timely respond. In June, the Court entered an order granting Milford's Motion for Entry of Default against all Defendants. Dkt. No. 15. In July, Meeks moved to set aside the default, dkt. no. 18, which the Court granted at a hearing on July 21, 2020, providing Meeks until July 23, 2020 to file a responsive pleading, see dkt. no. 24. On July 23, Meeks filed an Answer to Milford's pleading, dkt. no. 26, and, on the following day, Meeks separately filed the present Motion to Dismiss, dkt. no. 30. Even assuming

5

that Meeks' Motion to Dismiss was properly filed under Rule 12 of the Federal Rules of Civil Procedure, see Skitch v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002) (finding that pursuant to Rule 12, a motion to dismiss is inappropriate after an answer has been filed), his motion was plainly untimely pursuant to this Court's July 21, 2020 Order.

Furthermore, even if Meeks' motion had been timely, the Court finds that it would not be appropriate in this case to exercise its discretion to abstain from hearing Milford's action. In Ameritas Variable Life Insurance Company v. Roach, the Eleventh Circuit identified nine factors for courts to consider in determining whether to dismiss a pending declaratory judgment action in favor of a parallel state action:

> (1) The strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts;
> (2) whether the judgment in the federal declaratory action would settle the controversy;
> (3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue;
> (4) whether the declaratory remedy is being used merely for the purpose of "procedural fencing"—that is, to provide an arena for a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable;
> (5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;
> (6) whether there is an alternative remedy that is better or more effective;

6

>   (7) whether the underlying factual issues are important to an informed resolution of the case;
>   (8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court;
>   (9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

411 F.3d 1328, 1331 (11th Cir. 2005). Some of these factors are more pertinent to the instant action than others, and the Eleventh Circuit expressly noted that the above list is "neither absolute nor is any one factor controlling." Id. Rather the factors are to serve as "guideposts" in determining whether to exercise discretion to abstain. Id.

Here, the Court finds that the balance of the relevant factors weigh in favor of deciding the declaratory judgment action in this Court. Milford argues—and Meeks does not dispute—that because the Policy was issued and delivered in Kentucky, the law of that state should govern the Court's decision. Dkt. No. 16-1 at 6. Therefore, the Georgia Superior Court in which this action is pending has no greater interest—nor is it any more proficient—in interpreting Kentucky law than this Court. Accordingly, factors one, five, eight, and nine weigh heavily in favor of retaining the action.

Meeks argues under factor four that Milford is simply using this action as a means to obtain a judgment from this Court rather than rely on a state court decision. However, Meeks concedes that

7

he did not file a motion for summary judgment in the state court on the coverage issue until after Milford filed its declaratory judgment action in this Court. See Dkt. No. 30 at 3. Furthermore, while Meeks argues that the state action was pending long before Milford filed its federal action, Milford adequately explains that because of the pending global pandemic,[2] there have been understandably substantial delays in the state action such that federal court has become a more effective forum to obtain relief before Milford incurs substantial defense costs. The Court is persuaded that this is an acceptable basis for seeking federal relief.

Meeks also argues under factor seven that underlying factual issues are important to resolution of this case. Specifically, Meeks points out that factual issues related to causation will play a significant role in determining whether one or multiple accidents took place. However, as the Court explains below, Milford's motion for summary judgment requires that the Court construe the facts in favor of Meeks in reaching a determination. Because the Court will find that, even under that standard, only a single accident took place, it is difficult to imagine any

---

[2] As of the writing of this opinion, the United States continues to experience the effects of a global pandemic because of the spread of a novel Coronavirus commonly known as COVID-19. See In re: COVID-19 Public Health & Safety, No. MC120-004 (S.D. Ga. Mar. 17, 2020).

advantage Meeks might obtain at the state level in terms of the state court's construction of the facts.

Finally, Meeks points to a 2013 decision from this Court quoting language from the Supreme Court decision Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 495 (1942) to seemingly support the proposition that "if an issue can be resolved in a pending action between the same parties in state court, federal courts should decline to exercise jurisdiction." Dkt. No. 30 at 7 (citing Grange Mut. Cas. Co. v. Dasher, Bi, 6:12cv63, 2013 U.S. Dist. LEXIS 2260 (S.D. Ga. 2013)). However, the factors developed in Ameritas were expressly aimed at creating "guideposts in furtherance of" certain Supreme Court decisions, including Brillhart. See 411 F.3d at 1331. Clearly, the Eleventh Circuit did not interpret Brillhart to suggest that federal courts must *always* decline jurisdiction over declaratory judgment actions in favor of the state courts.[3] To the contrary, Brillhart stated that "*[o]rdinarily* it would be uneconomical as well as vexatious" for a federal court to decide declaratory judgment suits under certain circumstances. 316 U.S. 491 at 495 (emphasis added). The Court finds, in reliance on the relevant Ameritas factors, that the circumstances merit retaining Milford's declaratory judgment action and deciding Milford's pending summary judgment motion.

---

[3] Even in Dasher, the court noted that the relevant Ameritas factors "do not decisively counsel in favor of deference" to the state action. 2013 U.S. Dist. LEXIS 2260, at *19.

9

## II. Motion for Summary Judgment

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Investor Group.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. Factual disputes that are "irrelevant or unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the Court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who

10

has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan J. dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

The central dispute at hand is whether the three collisions on the date in question constitute a single accident or multiple accidents as that term is defined in the Policy. Under Kentucky law—which, as explained above, the parties concede is controlling—contract interpretation is a question of law for the courts. See Maze v. Bd. of Dirs. for Commonwealth Postsecondary Educ. Prepaid Tuition Trust Fund, 559 S.W. 3d 354, 363 (Ky. 2018); see also Equitania Ins. Co v. Slone & Garret, P.S.C., 191 S.W.3d 552, 556 (Ky. 2006). In interpreting a contract, courts first look to whether the contract is ambiguous. Bs. of Trustees of Ky. Sch. Bds. Ins. Trust v. Pope, 528 S.W.3d 901, 906 (Ky. 2017). Ambiguity exists in a contract where "a reasonable person would find it susceptible to different or inconsistent interpretations." Maze,

11

559 S.W.3d at 363 (quoting Hazard Coal Corp. v. Knight, 325 S.W.3d 290, 298 (Ky. 2010)). Where no ambiguity exists, the court must interpret the contract "strictly according to its terms," which it does "by assigning language its ordinary meaning and without resort to extrinsic evidence." Ky. Shakespeare Festival, Inc. v. Dunaway, 490 S.W.3d 691 (2016).

Alternatively, where contract language is ambiguous, "the court's primary objective is to effectuate the intentions of the parties." Maze, 559 S.W.3d at 298 (citing Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky. 2002)). However, "[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." Dunaway, 490 S.W.3d at 695. Indeed, while "ambiguous terms are to be construed in favor of the insured, '[the court] must also give the policy a reasonable interpretation, and there is no requirement that every doubt be resolved against the insurer.'" Davis v. Ky. Bureau Mut. Ins. Co., 495 S.W.3d 159, 162 (Ky. Ct. App. 159) (quoting Stone v. Ky. Farm Bureau Mut. Ins. Co., 34 S.W.3d 809, 811 (Ky. App. 2000)). "The mere fact that [a party] attempt[s] to muddy the water and create some question of interpretation does not necessarily create an ambiguity." Id. (quoting Ky. Ass'n of Ctys. All Lines Fund Trust v. McClendon, 157 S.W.3d 62, 633-34 (Ky. 2005)).

12

Here, the term "accident" as defined in the Policy is unambiguous, and, according to its plain meaning, encompasses all three collisions on the day in question. Indeed, the term is explicitly and clearly defined in the Policy and contemplates not just a single event that causes injury but also "continuous or repeated exposure to the same conditions" that cause injury. See Dkt. No. 14-1 at 148. Moreover, the "Limit of Insurance" section of the Policy further clarifies that multiple vehicle collisions may constitute the same "accident" for purposes of the Policy's coverage limits, noting that "repeated exposure" to the same conditions "will be considered as resulting from one 'accident.'" Dkt. No. 14-1 at 136. In this case, each of the claimants' injuries were undoubtedly caused by "repeated exposure"—i.e. repeated collisions—to a single condition—the overturned truck. Accordingly, there can be no doubt that each of these collisions constituted a single "accident" under the plain language of the Policy.

Meeks argues that the separate collisions were not part of the same "accident" because "different conditions" were at play during his collision in contrast with those of Buchanan and Johnson. Dkt. No. 27 at 11. Principally, Meeks points out that he collided with Mahad's overturned vehicle as it slid into the intersection whereas Buchanan and Johnson collided with the truck when it was unlit and stationary in the road. Meeks further alleges

13

that the Buchanan and Johnson wrecks occurred approximately ten to fifteen minutes after his own. Dkt. No. 27 at 4. However, Meeks argument is merely an effort to create an ambiguity that does not exist. See Davis, 495 S.W.3d at 162. As the Supreme Court of Georgia noted under a similar set of facts, defining "accident" by the number of impacts "would mean that there can never be one accident . . . in a multiple vehicle collision . . . because it is virtually impossible for multiple vehicles to collide truly simultaneously." State Auto Property & Cas. Co. v. Matty, 286 Ga. 611, 613 (2010). Likewise, it is difficult to imagine a scenario where each collision in a multi-vehicle collision was not characterized by slightly different conditions. Thus, the fact that Meeks is able to identify marginal differences between the collisions is not sufficient to render the term "accident" ambiguous.

Alternatively, Meeks argues that "different causative factors" played a role in the separate collisions such that they should be considered separate accidents. See Dkt. No. 27 at 11. Specifically, he contends that Mahad "failed to do anything to prevent the second and third wrecks," such as place reflective triangles or flares beside the scene or otherwise try to warn oncoming drivers. Id. at 4-6.[4] Kentucky courts, however, have

---

[4] Meeks also argues that the trooper who responded to the scene drafted separate accident reports for the three collisions. See Dkt. No. 27 at 6. However, he does not cite to any case law to suggest that separate accident reports play

14

rejected this theory. Both parties agree that Kentucky follows the "cause" approach to determining whether one or multiple "accidents" occurred under an insurance agreement. See Dkt. No. 16-1 at 8 (citing Continental Ins. Co. v. Hancock, 507 S.W.2d 146 (Ky. App. Ct. 1973); see also Dkt. No. 27 at 11-12 (citing Davis, 495 S.W.3d at 163). Pursuant to this theory, Kentucky courts have found that multiple occurrences or accidents do not arise merely because "there were multiple negligent and intentional acts and persons injured." Davis, 495 S.W.3d at 163 (describing the courts' holding in Continental).[5] Rather, the cause theory simply asks whether there is "but one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages." Id. (quoting Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61 (3rd Cir. 1982)). Even assuming that Mahad was negligent in failing to prevent the last two collisions, such negligence does not convert an otherwise single "accident" to multiple accidents where, as here, Mahad's overturned truck was a single "uninterrupted and continuing cause" that resulted in all of the

---

any dispositive role in determining the number of accidents that took place for insurance coverage purposes.

[5] In Davis, the court held that "merely because there were multiple negligent acts that combined to cause a single injury or multiple causes of action may be asserted does not mean there were multiple occurrences as that term is unambiguously defined . . . There are frequently multiple acts of negligence that cause a single injury." 495 S.W.3d at 166. In that case, the term "occurrence" was defined similarly to the way the Policy here defines "accident": "Occurrence is defined in the policy as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" Id. at 160.

15

subsequent injuries. Id.[6] Accordingly, the fact that Mahad may have been culpable for other negligent acts that contributed to the second and third wrecks does not render those wrecks separate accidents for purposes of the Policy.

## CONCLUSION

For the reasons above, Meeks' Motion to Dismiss, dkt. no. 30, is **DENIED**, and Milford's Motion for Summary Judgment, dkt. no. 16, is **GRANTED**. It is hereby **DECLARED** that Milford will have no further coverage obligations once the million dollars have been paid in connection with the December 18, 2016 tractor-trailer accident. The Clerk is **DIRECTED** to close this case.

**SO ORDERED**, this 4th day of September, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[6] This is not to suggest that separate negligent acts can never form separate accidents under an insurance policy. Rather, the Court finds only that where, as in this case, there is a single continuous and uninterrupted cause of all of the injuries, the fact that other negligent acts may have also contributed to those injuries does not disrupt the continuous nature of the underlying cause so as to create separate accidents.